IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | NO.    3:22-cr-00282 |
| v. | ) | |
| | ) | JUDGE RICHARDSON |
| GLEN CASADA | ) | |
| CADE COTHREN | ) | |

**TRIAL BRIEF OF THE UNITED STATES**

On April 22, 2025, Defendants Glen Casada and Cade Cothren will be tried on a 20-count public corruption indictment. This Trial Brief describes the procedural posture of the case; summarizes the government's case and the basic facts it intends to prove at trial; sets out the elements of the offenses; and briefs certain legal and evidentiary issues that may arise.

## I.    PROCEDURAL POSTURE

On March 4, 2022, the government charged Robin Smith with honest services wire fraud. (*See United States v. Smith*, 3:22-cr-00078, D.E. #1 (M.D. Tenn. Mar. 4, 2022).) She pled guilty to that charge on March 8, 2022, (*id.*, at D.E. #14), and is currently scheduled to be sentenced shortly after this trial, (*id.*, at D.E. #28).

On August 22, 2022, a grand jury returned a 20-count indictment against Defendants Casada and Cothren. Described in more detail below, the indictment charged Defendants with conspiracy, public corruption violations, and laundering the proceeds of those violations. (D.E. #3.) Since their indictment, the trial has been continued four times. (*See* D.E. #26, 79, 125, 130.)

The parties have engaged in substantial motion practice. Among other things, Casada filed a motion to dismiss (D.E. #59), which the Court denied (D.E. #129). Cothren filed a motion to dismiss (D.E. #65) and a motion to strike (D.E. #64), both of which the Court denied (D.E. #129); an emergency motion to quash a search warrant (D.E. #119), which the Court denied (D.E. #126);

and twice moved for a juror questionnaire (D.E. #207, 239), which the Court rejected (D.E. #209, 244). As an intervenor, Robin Smith also filed a motion to suppress, (D.E. #160), which Defendants opposed (D.E. #162, 163), and the Court granted. (D.E. #213).

Currently pending before the Court are a series of motions *in limine* (D.E. #179–81, and 184–88) and Defendants' Rule 611 motion (D.E. #274).

## II.    SUMMARY OF THE GOVERNMENT'S CASE

In 2019, Casada served in the Tennessee General Assembly as a member of the Tennessee House of Representatives. For about eight months that year, he was the Speaker of the House. Cothren was a businessman who served as Casada's chief of staff until, in May 2019, he was forced to resign based on allegations of misconduct and offensive text messages that were published in the media. A few months later, Casada also resigned his post as Speaker based on those allegations and text messages, but he remained a House member.

In November 2019, Cothren, with the knowledge and support of Casada and Smith, established a company called Phoenix Solutions, LLC with the goal of providing constituent mail services to members of the General Assembly and, eventually, to political campaigns for State offices. Every year, the State of Tennessee allocated each House member $3,000 to design, print, and mail legislative updates, surveys, and other approved materials to their constituents (the "Postage and Printing Allowance"). The General Assembly's Office of Legislative Administration and its Director of Legislation managed the Postage and Printing Allowance in consultation with the Speaker of the House. Among the Director's responsibilities related to the Postage and Printing Allowance were the approval of invoices and the management of disbursements of State funds to vendors. Ultimately, the Speaker's Office had the authority to approve or deny a vendor to provide mailer services funded by the Postage and Printing Allowance.

2

Beginning around October 2019, Casada, Cothren, and Smith conspired to profit off the Postage and Printing Allowance. The conspirators agreed that Casada and Smith would use their offices to pressure State officials to approve Phoenix Solutions as a Postage and Printing Allowance vendor; pressure State officials to cause and, when necessary, expedite payment of State funds to Phoenix Solutions, as well as to two consulting companies controlled by Smith (River's Edge Alliance or "REA") and Casada (Right Way Consulting or "RWC"); advise and pressure other State officials to use Phoenix Solutions, REA, and RWC for State-funded mailer work; and choose to use Phoenix Solutions, REA, and RWC for Casada and Smith's State-funded Postage and Printing Allowance expenditures. In exchange, Cothren would pay Casada and Smith bribes and kickbacks from Phoenix Solutions' profits.

To facilitate the scheme, the conspirators knew they had to conceal Cothren's involvement in Phoenix Solutions and the fact that he kicked back a portion of the company's profits to his co-conspirator legislators. They understood that, if anyone knew about Cothren's involvement or the kickbacks, Phoenix Solutions would not be approved by the State to be vendor, nor would it be hired by individual members of the Tennessee General Assembly. In one text message, for instance, Cothren told Casada, "we just have to make sure no one knows it's me involved." In another exchange, Casada wrote Cothren, "we want no one knowing your [sic] Phoenix." Cothren reassured Casada, "no one needs to know whose company it is."

Instead, the conspirators told State officials that Phoenix Solutions was run by a man named Matthew Phoenix, who they falsely held out to be an experienced political consultant. Cothren created an email for this fake persona—matthew@powerofphoenix.com—which he used to conduct company business. He also incorporated Phoenix Solutions in New Mexico and set up a company post office box there because that state allows for the anonymous registration of limited

3

liability companies. In addition, Cothren submitted to the State a falsified tax form that the State required of Postage and Printing Allowance vendors in the name of Matthew Phoenix.

The scheme worked. Casada and Smith pitched Phoenix Solutions to their colleagues, and the conspirators successfully tricked others into believing that Phoenix Solutions was run by Matthew Phoenix, an experienced political consultant previously affiliated with Jamestown Associates, a real Washington, D.C.–based consulting firm. Casada and Smith's colleagues accepted their recommendations and hired Phoenix Solutions to perform State-funded mailer work. When the conspirators thought the State was not paying fast enough, they pressured State officials to make payments.

Meanwhile, Casada and Smith were careful to hide both their personal interest in Phoenix Solutions and the extent of the State-funded work that the company was doing. They denied making any money from Phoenix Solutions, and they submitted sham invoices to the State in the names of REA and RWC for the purpose of secretly funneling money from the State to Phoenix Solutions through their own companies' bank accounts. Those sham invoices caused the State to disburse tens of thousands of dollars to REA and RWC.

Over the course of 2020, Phoenix Solutions, REA, and RWC received approximately $51,947 from the State in payments related to the Postage and Printing Allowance. During the same timeframe, Cothren paid Casada and Smith more than $35,000 in bribes and kickbacks.

## III.  CHARGES AND ELEMENTS

The indictment charges Casada and Cothren with 20 crimes: one count of conspiring to commit federal programs theft or fraud, federal programs bribery, and honest-services wire fraud, in violation of 18 U.S.C. § 371 (Count 1); one count of federal programs theft or fraud, in violation of 18 U.S.C. §§ 666(a)(1)(A) and 2 (Count 2); two counts of federal programs bribery, in violation

of 18 U.S.C. §§ 666(a)(1)(B), (a)(2) and 2 (Counts 3–4); six counts of honest services wire fraud, in violation of 18 U.S.C. §§ 1343, 1346, and 2 (Counts 5–10); one count of using a fictitious name to carry out a fraud, in violation of 18 U.S.C. §§ 1342 and 2 (Count 11); one count of money laundering conspiracy, in violation of 18 U.S.C. § 1956(h) (Count 12); and eight counts of money laundering, in violation of 18 U.S.C. §§ 1956, 1957, and 2 (Counts 13–20). The following are descriptions of the elements of the charged offenses.

### A. Conspiracy — 18 U.S.C. §§ 371, 1956(h) (Counts 1 and 12)

"The essential elements of the crime of conspiracy are that the alleged conspiracy existed, the defendant willfully became a member, and one of the conspirators knowingly committed at least one alleged overt act in furtherance of some object or purpose of the conspiracy."[1] *United States v. Ross*, 190 F.3d 446, 450 (6th Cir. 1999). Evidence of a formal agreement is not required. *United States v. Maliszewski*, 161 F.3d 992, 1006 (6th Cir. 1998). Mutual and tacit understanding from the facts and circumstances is sufficient to prove agreement. *Id.* A criminal conspiracy does not require proof that the unlawful purpose or object be achieved. *See United States v. Wheat*, 988 F.3d 299, 306 (6th Cir. 2021) (("The government need not prove that the conspirators completed their agreed-upon drug crime." (citing *United States v. Robinson*, 547 F.3d 632, 638 (6th Cir. 2008)). Rather, the crime is the agreement itself. *See United States v. Frazier*, No. 3:17-CR-00130, 2023 WL 4930187, at *27 (M.D. Tenn. Aug. 2, 2023).

Furthermore, "a defendant need not know every member of the conspiracy, the acts of other members, or even the full extent of the conspiracy to be held responsible for the acts of other members . . . . And 'once the existence of a conspiracy is shown, the evidence linking an individual

---

[1] Count One charges a conspiracy in violation of 18 U.S.C. § 371, which requires proof of an overt act. Count Twelve charges a conspiracy in violation of 18 U.S.C. § 1956(h), which does not. *Whitfield v. United States*, 543 U.S. 209, 214 (2005).

to a conspiracy need only be slight.'" *United States v. Smith-Kilpatrick*, 942 F.3d 734, 745 (6th Cir. 2019) (citations omitted). The Sixth Circuit's Pattern Jury Instructions reflect these same principles. The United States is required to prove that a defendant "knew the conspiracy's main purpose," but it is not required to prove that the defendant "knew everything about the conspiracy, or everyone else involved, or that he was a member of it from the very beginning." Sixth Circuit Pattern Jury Instr. 3.03. The United States does not have to prove "that a defendant played a major role in the conspiracy, or that his connection to it was substantial." *Id.* The pattern jury instructions also state that, "[o]nce an overt act is committed, the crime of conspiracy is complete[, a]nd any withdrawal after that point is no defense to the conspiracy charge." *Id.* at 3.11A(2)(C).

To prove a conspiracy under any of these statutes requires that a defendant knew "the object of the conspiracy and voluntarily associated himself with the conspiracy to further its objective." *United States v. Myint*, 455 F. App'x 596, 602 (6th Cir. 2012). The government may prove the existence of an agreement by "tacit or mutual understanding" to participate in a common purpose. *United States v. Agbebiyi*, 575 F. App'x 624, 634 (6th Cir. 2014) (citation omitted). A defendant need not know every detail of the conspiracy but must know the object of the conspiracy. *Id.* The *mens rea* for conspiracy is specific intent. *United States v. Trevino*, 7 F.4th 414, 425 (6th Cir. 2021). "The government must prove only that the conspirators acted with 'at least the degree of criminal intent necessary for the substantive offense' that was the object of the conspiracy." *Id.* (citation omitted).

### B. Federal Programs Theft or Fraud — 18 U.S.C. § 666(a)(1)(A) (Count 2)

To convict Defendants under 18 U.S.C. § 666(a)(1)(A), the government must show (1) that Casada "was an agent of [state] government at the time of the offense"; (2) that he "embezzled, stole, fraudulently obtained or willingly converted property worth at least $5,000 which was under

6

the control, care or supervision of the [state]"; and (3) that "the above elements occurred during a time in which the [state] . . . received in excess of $10,000 in any one year from a qualifying federal assistance program." *United States v. Johnson*, 79 F.4th 684, 712 (6th Cir. 2023) (citation omitted). Under any of § 666's subsections, the government can prove the transactional element by aggregating all relevant transactions that occurred within a one-year period. *See* 18 U.S.C. § 666(a)(1)(B), (a)(2) (describing the $5,000 threshold as applying to "any business, transaction, or *series of transactions*" (emphasis added)); *United States v. Sanderson*, 966 F.2d 184, 189 (6th Cir. 1992) (explaining, while affirming a conviction under § 666(a)(1)(A), that "under section 666, where multiple conversions are part of a single scheme, it seems appropriate to aggregate the value of property stolen in order to reach the $5,000 minimum required for prosecution").

### C. Federal Programs Bribery — 18 U.S.C. § 666(a)(1)(B) (Counts 3 and 4)

To convict Casada under 18 U.S.C. § 666(a)(1)(B) for soliciting and receiving bribes and kickbacks concerning programs receiving federal funds, the government must show: (1) that he was an agent of state government; (2) that he accepted, agreed to accept, solicited or demanded things of value from Cothren; (3) that he intended to be influenced or rewarded in connection with any business, transaction, or series of transactions of the State of Tennessee involving anything of value of $5,000 or more; (4) that he acted corruptly; and (5) that those elements occurred during a time when the state received in excess of $10,000 in any one year in federal assistance. *See United States v. Inman*, 39 F.4th 357, 365 (6th Cir. 2022); *Snyder v. United States*, 603 U.S. 1, 19 (2024).

On the flip side of the exchange, to convict Cothren under 18 U.S.C. § 666(a)(2) for offering or agreeing to give bribes and kickbacks concerning programs receiving federal funds, the government must show: (1) that Casada and/or Robin Smith were agents of the State of

Tennessee; (2) that Cothren gave, offered, or agreed to give them things of value; (3) that Cothren intended to influence or reward Casada or Robin Smith in connection with any business, transaction, or series of transactions of the State of Tennessee involving anything of value of $5,000 or more; (4) that Cothren acted corruptly; and (5) that those elements occurred during a time when the state received in excess of $10,000 in any one year in federal assistance. *See United States v. Warner*, 843 F. App'x 740, 747 (6th Cir. 2021) (finding that "the elements of conspiracy to pay and conspiracy to solicit a bribe merge completely when the co-conspirators are themselves the bribe's payor and payee").

### D.  Honest-Services Fraud — 18 U.S.C. §§ 1343, 1346 (Counts 5–10)

Honest-services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346, requires the government to show: (1) that the defendant participated in, devised, or intended to devise a scheme to defraud the public of its right to honest services or a public official through bribery or kickbacks; (2) that the scheme or artifice to defraud involved a material misrepresentation, false statement, false pretense, or concealment of material fact; (3) that the defendant did so knowingly and with the intent to defraud; and (4) the defendant transmitted, or caused to be transmitted, any writing, signal, or sound by means of a wire communication in interstate commerce or caused the transmission of any writing, signal, or sound of some kind by means of a wire communication in interstate commerce. Final Jury Instructions, *United States v. Hills et al.*, No. 1:16-cr-329, ECF No. 360, at 92, 100–101 (N.D. Ohio Oct. 1, 2018) (hereinafter, *Hills Jury Instr.*), *aff'd*, 27 F.4th 1155 (4th Cir. 2022), *cert. denied*, 143 S. Ct. 305 (Oct. 11, 2022), 143 S. Ct. 606 (Jan. 9, 2023); *see also Skilling v. United States*, 561 U.S. 358, 412–413 (2010).

8

### E.  Use of a Fictitious Name — 18 U.S.C. § 1342 (Count 11)

For Count 11, use of a fictitious name to carry out a fraud, in violation of 18 U.S.C. § 1342, the government must show: (1) that Defendant Cothren used or assumed, or requested to be addressed by, any fictitious, false, or assumed name or a name other than his own proper name; and (2) that he did so for the purpose of conducting, promoting, and carrying on by means of the United States Postal Service an unlawful business, that is, the fraudulent operation of Phoenix Solutions. 18 U.S.C. § 1342; *see also United States v. Rajwani*, 476 F.3d 243, 245 (5th Cir. 2007). The government need not prove that Phoenix Solutions operated unlawfully—only that the defendants used a false name to conduct some unlawful business. And here, the Indictment alleges that the conspirators created the Matthew Phoenix persona to facilitate federal programs theft and bribery, honest services wire fraud, and money laundering. *See* Indictment ¶¶ 23, 28, 33, 37, 46–48; *see also United States v. Odutayo*, 406 F.3d 386, 393 (5th Cir. 2005) (recognizing that § 1342 prohibits a broader range of conduct than the mail fraud statute because it extends to the use of a false name to promote "any other unlawful business," which may not involve fraud); *cf. United States v. White*, 543 F. App'x 563, 565 (6th Cir. 2013) (unpublished) (affirming, without analysis, convictions under § 1342 alongside convictions for conspiracy to defraud the United States, wire fraud, and bank fraud).

### F.  Concealment Money Laundering — 18 U.S.C. § 1956(a)(1)(B)(i) (Counts 13–18)

Counts 13 through 18 of the indictment charge the defendants with conducting a financial transaction in violation of federal law, known colloquially as "concealment money laundering." *See United States v. McGahee*, 257 F.3d 520, 526 (6th Cir. 2001). That offense requires the government to show that (1) the defendant conducted a financial transaction; (2) the financial transaction involved property that represented the proceeds of federal programs fraud, as charged

in Count 2, federal programs bribery, as charged in Counts 3 and 4, or honest services wire fraud, as charged in Counts 5 through 10; (3) the defendant knew that the property involved in the financial transaction represented the proceeds from some form of unlawful activity; and (4) the defendant knew that the transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of federal programs fraud, federal programs bribery, or honest services wire fraud. *See* Sixth Circuit Pattern Jury Instr. 11.02.

### G. Spending Money Laundering — 18 U.S.C. § 1957 (Counts 19–20)

Counts 19 and 20 of the indictment charge the defendants with engaging in a monetary transaction in violation of federal law, also known as spending money laundering. That offense requires the government to show that (1) the defendant knowingly engaged in a monetary transaction; (2) the monetary transaction was in property derived from specified unlawful activity; (3) the property had a value greater than $10,000; (4) the defendant knew that the transaction was in criminally derived property: and (5) the monetary transaction took place within the United States. Sixth Circuit Pattern Jury Instr. 11.06.

### H. Aiding and Abetting — 18 U.S.C. § 2 (Counts 2–11, 13–20)

Finally, all the substantive counts in the indictment (Counts 2–11, 13–20) charge that the defendants aided and abetted the commission of the offense. Therefore, it is not necessary for the jury to find that the defendant personally committed the crime charged. Rather, the jury may also find him guilty if he intentionally helped or encouraged someone else to commit the crime. *See* Sixth Circuit Pattern Jury Instr. 4.01; *Hills Jury Instr.* at 62–63. To convict either defendant on an aiding and abetting theory, the government must show: (1) that the crime charged in Counts 2 through 11 and Counts 13 through 20 was committed; (2) that the defendant helped to commit the crime or encouraged someone else to commit the crime; and (3) that the defendant intended to help

commit or encourage the crime. *See* Sixth Circuit Pattern Jury Instr. 4.01; *Hills Jury Instr.* at 62–63. Proof that the defendant may have known about the crime, even if he was there when it was committed, is not enough the sustain a guilty verdict. However, the jury can consider it in deciding whether the government has proved that he was an aider and abettor.

## IV.    EVIDENCE

The United States anticipates presenting the following evidence to prove the allegations in the indictment. During the three years this case has been pending, the government has produced a significant volume of discovery, including, but not limited to, government records, bank records, audio and video recordings, device images, and reports of interviews.

### A.  Witnesses

In its case-in-chief, the United States intends to call approximately fifteen witnesses to prove the facts described above. Many of these witnesses will be State of Tennessee officials. For example, the then–Director of the Office of Legislative Affairs will testify about the operation of the Postage and Printing Allowance and her interactions with the conspirators. The Speaker of the House will testify about the requirements of the Postage and Printing Allowance. State legislators and other state officials will testify that they were deceived by the conspirators regarding the operations of Phoenix Solutions. A State official will testify that Tennessee received more than $10,000 in federal benefits in each of 2019, 2020, and 2021.

The parties have agreed to several evidentiary stipulations, described below, which have obviated the need for some, but not all, ministerial authentication issues. Accordingly, the United States also anticipates calling several FBI agents. Two agents will authenticate audio recordings of interviews that the FBI conducted, separately, with each of Casada and Cothren. Another FBI agent will read otherwise-authenticated texts and emails between Defendants.

11

In addition to state and federal witnesses, Robin Smith will testify about her unlawful agreement with Defendants. Finally, the United States will call a forensic accountant who will testify regarding the flow of funds in the conspiracy and relevant bank records.

## B. Exhibits

The United States anticipates introducing a number of exhibits. They generally fall into the following categories:

1.  Email communications among the conspirators and with other parties;

2.  Text messages among the conspirators and with other parties;

3.  Recorded interviews of Defendants;

4.  Recordings of Cothren and Robin Smith in furtherance of the conspiracy;

5.  Business invoices;

6.  Certified public records;

7.  Relevant statutes and other sources of law;

8.  Documents obtained during the search of Cothren's apartment;

9.  Bank and other business records; and

10. Rule 1006 summaries, charts, and calculations of transactions.

To encourage trial efficiency, the United States will provide a flash drive of its anticipated exhibits to defense counsel in advance of trial.

## V.    Evidentiary Issues

On August 20, 2024, the United States filed its motions *in limine*. (D.E. #179.) In addition to the matters raised therein, the following issues may arise at trial.

### A. Stipulations

The parties have entered into evidentiary and proof stipulations. As to the admissibility of evidence, the parties have entered into the following stipulations, among others:

1. The records included in the government's production of the extraction of Casada's phone are true and accurate copies of records found on his phone, and their admission does not require the testimony of the forensic analyst who conducted the extraction and created the report;

2. The records included in the government's production of the extraction of Cothren's phone are true and accurate copies of records found on his phone, and their admission does not require the testimony of the forensic analyst who conducted the extraction and created the report;

3. The records in the government's production of the extraction of Robin Smith's phone are true and accurate copies of records found on her phone, and their admission does not require the testimony of the forensic analyst who conducted the extraction and created the report;

4. The records in the government's production of several electronic devices identified in a letter from Cothren's counsel dated September 13, 2024, do not require the testimony of the forensic analyst who conducted the extraction and created the report;

5. Verizon records that Cothren produced to the government on July 6, 2023, and August 21, 2024, are true and accurate copies of the subscriber's phone records, and their admission does not require the testimony of the custodian who created the report and/or produced the records; and

6. The following documents are authentic, non-hearsay business records and do not require testimony from a custodian of records for admission:

| Description |
| --- |
| Phoenix Solutions' bank records |
| • Account ending in x3484 |
| • Account ending in x3505 |
| • Account ending in x3886 |
| • Account ending in x5817 |
| • Account ending in x8633 |
| • Account ending in x9665 |

| |
|---|
| Phoenix Solutions' WePay records |
| Glen Casada's bank records<br>&bull; Account ending in x0111<br>&bull; Account ending in x1728<br>&bull; Account ending in x3030<br>&bull; Account ending in x4594<br>&bull; Account ending in x5118<br>&bull; Account ending in x6024<br>&bull; Account ending in x6927<br>&bull; Account ending in x7814<br>&bull; Account ending in x8687<br>&bull; Account ending in x9906<br>&bull; Account ending in x9971 |
| Casada's Campaign and PAC bank records<br>&bull; Account ending in x1364<br>&bull; Account ending in x1372<br>&bull; Account ending in x1881 |
| Right Way Consulting's bank records<br>&bull; Account ending in x4447 |
| Cade Cothren's bank records<br>&bull; Account ending in x3395<br>&bull; Account ending in x3402 |
| Faith Family Freedom Fund's bank records<br>&bull; Account ending in x9606 |
| Robin Smith and Rivers Edge Alliance's bank records<br>&bull; Account ending in x0738 |
| Subscriber information for matthew@powerofphoenix.com |

The United States does not anticipate reading these stipulations as to admissibility into the record.

As to proof, Defendants have agreed to the following stipulations:

1. The wire communications identified in each of Counts 5, 6, 7, 8, 9, and 10 traveled in interstate or foreign commerce; and

2. Between at least January 1, 2018, and December 31, 2021, SunTrust Bank and First Horizon Bank were engaged in interstate commerce and their activities affected interstate commerce.

14

The United States anticipates reading these stipulations to the jury at an appropriate time.

### B. Certificates of Authenticity

The United States plans to offer records obtained from the conspirator's email providers, including Google (for records related to the email addresses cadecothren@gmail.com and matthew@powerofphoenix.com) and GoDaddy (for records related to the email address robin@riversedgealliance.org). It produced these email records to Defendants in 2023. The records included declarations from Google and GoDaddy records custodians that complied with Federal Rules of Evidence 902(11) and 902(13). The government intends to rely on these declarations to authenticate the records obtained from Google and GoDaddy.

In addition, as part of its Rule 404(b) evidence, the United States will offer some of Cothren's X (formerly Twitter) messages. The government produced these records to Defendants in 2024. The production was accompanied by a declaration from a Twitter custodian of records which complied with Rules 902(11) and 902(13). On March 21, 2025, the government gave Defendants explicit notice of its intent to rely on the declaration.

With other evidence in the X account that indicates Cothren's control of it, this certification is sufficient to establish the authenticity of the records. *See United States v. Quintana*, 763 F. App'x 422, 427 (6th Cir. 2019) (rejecting authenticity challenge to district court's admission of records from defendant's Facebook page where there was "an account in defendant's name, an email address with his name and moniker, a location linked to defendant, dates that correspond to witness testimony, and a picture of defendant"); *United States v. Perez*, 61 F.4th 623, 626 (8th Cir. 2023) ("[A] party may authenticate social media evidence with circumstantial evidence that adequately links a particular person to the social media account."); *United States v. Banks*, 29 F.4th

168, 182 (4th Cir. 2022) (affirming authentication of social media records with certificate from company and records from account indicating defendant's control).

### C. *Bruton* and Co-Defendant Admissions

In January 2021, the FBI separately interviewed Casada and Cothren, and each made inculpatory admissions. During those admissions, each mentioned his co-defendant by name. Accordingly, unedited portions of these recordings may trigger the Supreme Court's prohibition on testimonial statements by codefendants. *See Bruton v. United States*, 391 U.S. 123 (1968).

In *Bruton*, the Supreme Court held that the admission of a non-testifying co-defendant's "confession in [a] joint trial violated [the defendant's] right of cross-examination secured by the Confrontation Clause of the Sixth Amendment." *Id.* at 126. Later Supreme Court decisions "distinguish[ed] between confessions that directly implicate a defendant and those that do so indirectly." *Samia v. United States*, 599 U.S. 635, 648–652 (2023) (discussing *Richardson v. Marsh*, 481 U.S. 200 (1987), and *Gray v. Maryland*, 523 U.S. 185 (1998)); *see id.* at 653 (explaining *Gray* "reiterated that the *Bruton* rule applies only to 'directly accusatory' incriminating statements, as distinct from those that do 'not refer directly to the defendant' and 'bec[o]me incriminating only when linked with evidence introduced later at trial'" (quoting *Gray*, 523 U.S. at 194, 196)).

Given the length of each Defendant's interview, the United States already intends to introduce only excerpts of the recorded interviews. From those excerpts, the United States will remove those portions of each Defendant's recorded confession where that Defendant directly implicates his co-Defendant, as opposed to another co-conspirator, such as Robin Smith. Those changes will consist of silences in audio recordings and reference to "another person" in transcripts. These steps, when coupled with an appropriate limiting instruction, are constitutionally

sufficient. *See Samia*, 599 U.S. at 640. The government is also willing to submit the proposed transcripts to the Court and the Defendants in advance of trial to ensure that the proffered evidence complies with *Bruton* and its progeny. *See* 30 CHARLES ALAN WRIGHT ET AL., *Federal Practice and Procedure* § 6682 (2d ed. 2024) (describing cases "in which a trial judge 'closely supervised the redaction process'" as "an eminently sensible idea that reduces the risk of a *Bruton* violation").

Of course, the United States also intends to introduce nontestimonial statements of each Defendant. These are admissible without redaction. *See United States v. Johnson*, 581 F.3d 320, 326 (6th Cir. 2009) ("Because it is premised on the Confrontation Clause, the *Bruton* rule, like the Confrontation Clause itself, does not apply to nontestimonial statements.").

### D. Use of Charts and Demonstratives

At trial, the government will offer business and bank records documenting transactions involving Defendants, Smith, Phoenix Solutions, Right Way Consulting (Casada's company), and Rivers Edge Alliance (Smith's company). These records will be voluminous. Thus, in addition to admitting certain underlying records themselves, the government plans to use summary charts and demonstrative exhibits to aid the jury in examining and understanding the evidence. The use of such charts is permitted under the Federal Rules of Evidence and Sixth Circuit law.

Summary charts—also known as "primary-evidence summaries"—are traditionally admitted as evidence "to aid the jury in the examination of testimony or documents in evidence." *United States v. Paulino*, 935 F.2d 739, 753 (6th Cir. 1991), *superseded by statute on other grounds as stated in United States v. Caseslorente*, 220 F.3d 727, 736 (6th Cir. 2000). The Sixth Circuit specifically recognizes that summary charts are admissible both under Federal Rule of Evidence 1006 and by the "established tradition" of the circuit. *Id.*; *accord United States v. Campbell*, 845 F.2d 1374, 1381 (6th Cir. 1988); *United States v. Scales*, 594 F.2d 558, 563 (6th Cir. 1979). The

admission of a summary chart is generally within the discretion of the trial court, whose decision is accepted absent a showing of abuse of discretion. *United States v. Moses*, 337 F. App'x 443, 447 (6th Cir. 2009).

There are several preconditions to admitting a summary chart under Rule 1006: (1) the records must be so voluminous that the jury cannot conveniently examine them in court, meaning that they are "sufficiently numerous as to make comprehension 'difficult and . . . inconvenient'"; (2) the records must be made available to the other parties at a reasonable time and place; (3) the underlying records must be admissible as evidence; (4) the summary "must be accurate and nonprejudicial"; and (5) the summary must be introduced through "the testimony of the witness who supervised its preparation." *United States v. Bray*, 139 F.3d 1104, 1109–11 (6th Cir. 1998) (omission in original) (citations omitted). When a summary chart is introduced, the summary itself becomes the substantive evidence and no limiting instruction should be given. *Id*. at 1111. However, even when it is not necessary, courts in the Sixth Circuit allow for both the voluminous records and the summary chart to be introduced as evidence. *See Moses*, 337 F. App'x at 448 (affirming admission of summary chart when the jury was provided with the underlying exhibits as well); *Campbell*, 845 F.2d at 1381 (same). The Government anticipates that most—if not all—of the charts presented to the jury will constitute Rule 1006 summary charts.

While the Government anticipates relying on Rule 1006, the Government notes that two other bases exist for the introduction of these charts—and potentially other exhibits that may become necessary during trial.

Rule 611(a) allows for "pedagogical-device summaries," such as a demonstrative aide, to be used at trial; such aides do not themselves constitute evidence. "Pedagogical-device" means:

> an illustrative aid . . . that (1) is used to summarize or illustrate evidence, such as documents, recordings, or trial testimony, that has been admitted in evidence; (2) is

18

itself not admitted into evidence; and (3) may reflect to some extent, through captions . . . or descriptions, the inferences and conclusions drawn from the underlying evidence by the summary's proponent.

*Bray*, 139 F.3d at 1111. When pedagogical-device summaries are introduced at trial, courts should generally give a limiting instruction to the jury informing them of the exhibit's summary purpose, while advising them that the exhibit itself is not evidence. *See Paulino*, 935 F.2d at 753 (finding no abuse of discretion in admitting organizational chart reflecting defendant's roles in cocaine conspiracy where, although limiting instruction was not given before witness testified, proper instruction was given at close of proof). "Quite often [pedagogical devices] are used on summation." *Gomez v. Great Lakes Steel Div., Nat'l Steel Corp.,* 803 F.2d 250, 257 (6th Cir. 1986) (citation omitted).

There is also a third category of summary charts—"secondary-evidence summaries"—that combines a Rule 1006 primary-evidence summary chart with a pedagogical-device summary under Rule 611(a). *Bray*, 139 F.3d at 1111–12. Secondary-evidence summaries are admitted into evidence, "not in lieu of the evidence they summarize but *in addition thereto*." *Id*. at 1112. The trial court has discretion to introduce these secondary-evidence summaries, generally because they "so accurately and reliably summarize complex or difficult evidence that is received in the case as to materially assist the jurors in better understanding the evidence." *Id.*

### E. Reciprocal Discovery

In response to the government's requests for reciprocal discovery, Cothren has produced the following documents:

1. Verizon records and an associated proof of service;

2. An EIN;

3. Articles of incorporation;

4. Proof of service for a subpoena, and an associated email;

5. A Tennessee Secretary of State LLC submission;

6. A New Mexico LLC filing;

7. Tennessee Open Records Act requests and an associated email; and

8. Legislative updates/surveys for ten legislators.

Casada has not produced any reciprocal discovery. On April 8, 2025, Defendants permitted the government to inspect 101 anticipated trial exhibits, some of which Cothren had previously produced in discovery.

Federal Rule of Criminal Procedure 16(b)(1)(A) provides that, after the government produces discovery,

> the defendant must permit the government, upon request, to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items if:
>
> > (i) the item is within the defendant's possession, custody, or control; and
> >
> > (ii) the defendant intends to use the item in the defendant's case-in-chief at trial.

This Rule helps "eliminate the idea that a criminal trial is a sporting contest in which a game of cat and mouse is acceptable." *United States v. Howell*, 231 F.3d 615, 626 (9th Cir. 2000). In this District, acceptance of discovery by a defendant "will be deemed to trigger the defendant's reciprocal discovery obligations." L. Cr. R. 16.01(a)(1)(A). The discovery accepted by a defendant need not be complete to trigger his obligations; "compliance in this context means *substantial* compliance, not *total* compliance that is completely faultless." *United States v. Crinel*, No. CR 15-61, 2016 WL 5779778, at *2 (E.D. La. Oct. 4, 2016) (citation omitted).

20

A defendant's "case-in-chief" includes non-impeachment evidence and testimony offered through the government's witnesses. *United States v. Daskal*, No. 21-CR-110, 2023 WL 9424080, at *11 (E.D.N.Y. July 12, 2023) ("The term 'case-in-chief' in the Rule 16 context has been interpreted to refer to the purpose of the evidence's introduction and not the timing of the evidence's introduction." (cleaned up)); *United States v. Sanft*, No. CR 19-00258, 2021 WL 5283959, at *2 (W.D. Wash. Nov. 12, 2021) (similar); *United States v. Hsia*, No. 98-57, 2000 WL 195067, at *2 (D.D.C. Jan. 21, 2000) (similar); *Crinel*, 2016 WL 5779778, at *4 (holding that "a defendant's case-in-chief includes any documents a defendant intends to use during cross-examination of a government witness except for the purpose of impeachment"); *see also United States v. Ellison*, 704 F. App'x 616, 625 (9th Cir. 2017) ("The district court properly refused to limit Appellants' production obligation to those exhibits they planned to introduce with their own witnesses by refusing to cabin their 'case-in-chief' to the period after which they called their first witness at trial, because a defendant may establish his defense by cross-examining the government's witnesses.").

Likewise, a defendant cannot avoid his discovery obligations by claiming that non-disclosed materials will be offered partially for impeachment purposes if those materials are, in truth, primarily offered to support the defendant's case-in-chief. "If [a] defendant seeks to offer an item [at trial] which has not been disclosed, the court will exclude the item if its primary purpose goes to her case-in-chief even if it is purportedly offered for impeachment." *United States v. Liberto*, 565 F. Supp. 3d 739, 745 (D. Md. 2021) (citation omitted); *see also United States v. Young*, 248 F.3d 260, 269–70 (4th Cir. 2001) (affirming district court's exclusion of audiotapes that the defendant attempted to introduce during cross-examination of a government witness because, in truth, the defendant "*intended* to offer the tapes not for impeachment purposes, but as

'evidence in chief'"); *Hsia*, 2000 WL 195067, at *2 ("If defendant seeks to introduce evidence through cross-examination that . . . is part of her case-in-chief and defendant has not provided the evidence to the government . . . , the Court will remedy the deficiency . . . by using the sanctions identified in Rule 16(d)(2) of the Federal Rules of Criminal Procedure, including the possible exclusion of evidence . . . ." ); *United States v. Heine*, No. 3:15-cr-238, 2017 WL 4423408, at *8 (D. Or. Oct. 5, 2017) ("Evidence that is offered primarily to *prove or disprove* an element of a claim or defense is not evidence that is offered to impeach the credibility of a witness and thus is not impeachment evidence; it must be disclosed in accordance with Rule 16.").

A defendant cannot game Rule 16(b) by contending that he does not "intend to use" documents until he decides whether to testify and thus has no production obligation until that point. *See United States v. Wills*, 40 F.4th 330, 338 (5th Cir. 2022). Nor can the defendant simply reserve the right to present at trial any of the discovery the government has provided. The reciprocal discovery requirement extends to any materials covered by Rule 16, even if they may already be in the government's possession. *See Liberto*, 565 F. Supp. 3d at 745 (stating that "courts have considered and rejected the argument that the fact that the government already possesses certain material means that the defendant has no further obligation under Rule 16(b)"); *Hsia*, 2000 WL 195067, at *1 ("The fact that the government already is in possession of the documents does not eliminate defendant's duty to disclose them.").

If Defendants seek to introduce substantive evidence that they have not produced in reciprocal discovery, the United States will move for its exclusion under Rule 16(d)(2).

### F.  Subpoenas to FBI Special Agents and *Touhy*

Cothren has subpoenaed four FBI agents and a former FBI forensic accountant ("FA") to testify.[2] Pursuant to *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951) and 28 C.F.R. 16.21, *et seq.*, the United States has notified Defendants that the following agents are authorized pursuant to those regulations to testify as defense witnesses, limited to the following scope of testimony:

1.  FBI SA Brent Hayden

    a.  Statements and conduct of other witnesses that he personally observed.

    b.  His personal observations of Cothren, and Cothren's purported cooperation with the government.

2.  FBI SA Matthew Pruitt

    a.  His personal observations of an interview and proffer with Robin Smith identified in a letter from Cothren's counsel dated March 4, 2025, and the FD-302 reports of that interview and proffer.

3.  FBI SA Ryan Saint-Blancard

    a.  His personal observations of three witness interviews identified in a letter from Cothren's counsel dated March 17, 2025, and the FD-302 reports of those interviews.

4.  FBI SA Clayton Worcester

    a.  His personal observations of eight witness interviews identified in a letter from Cothren's counsel dated March 4, 2025, and the FD-302 reports of those interviews.

5.  Former FBI FA Victoria Howell

    a.  Her personal observations of an interview of Mr. Casada on January 8, 2021; and

---

[2]      Cothren previously subpoenaed four additional FBI agents, but subsequently withdrew these subpoenas.

b.  The fact that she received specific bank records identified in a letter from Cothren's counsel dated March 4, 2025.

SAs Hayden, Pruitt, Worcester, and former FA Howell are also authorized to testify as to whether Robin Smith has a cooperation plea agreement, what the terms of that agreement are, and what they have personally observed when interacting with Ms. Smith as it relates to her cooperation. They are not authorized to opine on the meaning of terms in her plea agreement, whether she is in compliance with any particular term of any cooperation plea agreement, or to otherwise render an opinion on her cooperation.

These witnesses are also authorized to testify about their personal observations of witness interviews or proffers, and the FD-302 reports of those interviews or proffers, that were produced to defense counsel on or after March 4, 2025.

These witnesses are not authorized to testify regarding any other topic, including confidential human sources. *See* 28 C.F.R. § 16.26(b)(4). Nor may they testify to the extent their testimony would "violate a statute . . . or a rule of procedure, such as the grand jury secrecy rule," *id.* § 16.26(b)(1), or "reveal investigatory records compiled for law enforcement purposes and . . . interfere with enforcement proceedings or disclose investigative techniques and procedures the effectiveness of which would thereby be impaired, *id.* § 16.26(b)(5). The United States reserved its right to object to the testimony of these witnesses on any ground other than compliance with the *Touhy* regulations.

Respectfully submitted,

ROBERT E. McGUIRE
Acting United States Attorney for the
Middle District of Tennessee

24

*/s/ Taylor Phillips*
TAYLOR PHILLIPS
Assistant United States Attorney
719 Church Street, Ste 3300
Nashville, Tennessee 37203
Telephone: 615-736-5151

*/s/ John P. Taddei*
JOHN P. TADDEI
BLAKE J. ELLISON
Trial Attorneys
Public Integrity Section, Criminal Division
United States Department of Justice